## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. DARRYL STRUCKE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>1. MIDLAND FINANCIAL CO.,<br>2. IPSWITCH, INC., and<br>3. PROGRESS SOFTWARE CORPORATION,<br><br>Defendants. | Case No. CIV-23-782-D<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Darryl Strucke ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to himself, and on information and belief as to all other matters, by and through undersigned counsel, brings this Class Action Complaint against Defendants Midland Financial Co. ("Midland"), Ipswitch, Inc. ("Ipswitch"), and Progress Software Corporation ("Progress") (together, "Defendants").

## NATURE OF THE ACTION

1.     Plaintiff brings this class action against Defendants for their failure to secure and safeguard his and other similarly situated individuals personally identifiable information ("PII"), including but not limited to names, Social Security numbers, and financial account numbers.

2.     Midland Financial Co. is the holding company for MidFirst Bank and its online-banking division known as Vio Bank. Plaintiff and Class members are customers of MidFirst Bank or Vio Bank whose PII was disclosed to unauthorized third parties during a massive data breach compromising Defendants Ipswitch and Progress Software's MOVEit Transfer and MOVEit

Cloud ("MOVEit") software that occurred between approximately May 27, 2023 and May 31, 2023 (the "Data Breach").

3.    During the Data Breach, and due to Defendants' data security and privacy shortcomings, unauthorized persons were able to gain access to files containing the PII of Midland's customers by exploiting a vulnerability in the MOVEit platform.

4.    Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their PII from unauthorized access and disclosure.

5.    As a result of Defendants' inadequate security measures and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all of Midland's customers whose PII was exposed as a result of the Data Breach.

6.    Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, breach of fiduciary duty, violations of the California Consumer Privacy Act, violations of the California Unfair Competition Law, and unjust enrichment, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### *Plaintiff Darryl Strucke*

7.    Plaintiff Darryl Strucke is a citizen of the State of California.

8.      Plaintiff Strucke was required to provide his PII to Midland in connection with using online banking services through MidFirst Bank's online-banking division, Vio Bank.

9.      Based on representations made by Midland, Plaintiff Strucke believed that Midland had implemented and maintained reasonable security and practices to protect his PII, including ensuring third parties it contracts with and shares PII with maintain adequate data security and practices.

10.     In connection with providing banking or other financial services to Plaintiff, Midland collected, maintained, and shared Plaintiff's PII on its systems, including the MOVEit file-transfer software.

11.     Had Plaintiff known that Defendants do not adequately protect the PII in their possession, including Midland by not ensuring that the third parties it contracts with in relation to providing banking or financial services to customers maintain adequate data security systems and practices, he would not have agreed to provide his PII to Midland.

12.     Plaintiff received a letter from Vio Bank notifying him that his PII was exposed in the Data Breach.

13.     As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, inter alia: a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; deprivation of the value of his PII; and overpayment for services that did not include adequate data security.

***Defendant Midland Financial Co.***

14.     Defendant Midland Financial Co. is the holding corporation for MidFirst Bank that has its principal place of business in Oklahoma. Midland Financial Co. is headquartered at 501

N.W. Grand Blvd., Oklahoma City, OK 73118. It may be served through its registered agent: Anika C. Stucky, 501 N.W. Grand Blvd., Oklahoma City, OK 73118.

***Defendant Ipswitch, Inc.***

15.    Defendant Ipswitch, Inc. is a Massachusetts for profit corporation with its principal place of business located at 15 Wayside Road, 4th Floor, Burlington, MA 01803. It may be served through its registered agent: C T Corporation System, 155 Federal St., Suite 700, Boston, MA 02110.

***Defendant Progress Software Corporation***

16.    Defendant Progress Software Corporation is a Delaware corporation with a principal place of business located at 15 Wayside Road, Suite 4, Burlington, MA 01803. It may be served through its registered agent: Corporation Service Company, 84 State St., Boston, MA 02109.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00) and is a class action in which Plaintiff is a citizen of a state different from Defendants. Further, greater than two-thirds of the Class members reside in states other than the states in which Defendants are citizens.

18.    The Court has personal jurisdiction over Defendant Midland Financial Co. because it is an Oklahoma corporation, has its principal place of business in Oklahoma, and transacts significant business in Oklahoma.

19.     The Court has personal jurisdiction over Defendants Ipswitch, Inc. and Progress Software Corporation because Defendants transact significant business in Oklahoma, and otherwise have sufficient minimum contacts with and intentionally avail themselves of the markets in Oklahoma through their promotion, marketing, and sale of MOVEit software and other software, products, and related services.

20.     Venue properly lies in this judicial district because, *inter alia,* Defendant Midland Financial Co.'s principal place of business is located in this District, Defendants transact substantial business in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Ipswitch, Inc., Progress Software, and the Unsecure MOVEit Software*

21.     Defendant Ipswitch is an IT software development company founded in 1991 in Burlington, Massachusetts. Ipswitch sells its software and related products and services, including MOVEit solutions, directly and through resellers and distributors in the United States.

22.     Defendant Progress, a public domestic software company based in Massachusetts, is Ipswitch's parent company.

23.     Ipswitch developed and through Progress sells the MOVEit software, which they claim is "the leading secure Managed File Transfer (MFT) software used by thousands of organizations around the world to provide complete visibility and control over file transfer activities."[1]

---

[1] *MOVEit*, IPSWITCH, https://www.ipswitch.com/moveit (last accessed Sept. 5, 2023).

24.     On their websites, Defendants Ipswitch and Progress make a host of claims about data security and their MOVEit product. Ipswitch claims, generally, that its "Enterprise File Transfer Solutions – Mak[e] the networked world a safer place."[2] Its website states: "Our efficient, easy-to-use products empower customers to respond faster to business demands through accelerated implementation and improved productivity and security."[3]

25.     Specific to MOVEit, Ipswitch claims that "MOVEit enables your organization to meet compliance standards, easily ensure the reliability of core business processes, and secure the transfer of sensitive data between partners, customers, users and systems."[4] Ipswitch claims its MOVEit Transfer and MOVEit Cloud products give customers "control" over their businesses; "provides full security, reliability and compliance"; provide "encryption, security, activity tracking tamper-evident logging, and centralized access controls to meet your operational requirements"; "[r]eliably and easily comply with SLAs, internal governance requirements and regulations like PCI, HIPAA, CCPA/CPRA and GDPR"; and provide "secure and managed file transfer."[5]

26.     Progress makes similar statements about data security. Its website claims "MOVEit provides secure collaboration and automated file transfers of sensitive data" and that it provides "[e]ncryption and activity tracking enable compliance with regulations such as PCI, HIPAA and GDPR."[6]

---

[2] *Ipswitch.com*, IPSWITCH, https://www.ipswitch.com (last accessed Sept. 5, 2023).

[3] *Id*.

[4] *See MOVEit*, *supra* note 1.

[5] *Id*.

[6] *MOVEit*, PROGRESS, https://www.progress.com/moveit (last accessed Sept. 5, 2023).

27.    Progress also touts all of the following on its website regarding MOVEit:[7]



# Securely Share Files Across the Enterprise and Globally

Reduce the risk of data loss and non-compliance with a fully-auditable and managed file transfer solution. Extend file transfer capabilities to all users to eliminate insecure use of email and quickly onboard partners and third-parties. Easily create automated file transfer tasks and workflows to accelerate your business and eliminate the risk of user error. Track and report on every single transfer.

**✓ Transfer Sensitive Information Securely**

Encryption in-transit and at-rest and advanced security features keep sensitive information out of harm's way.

**✓ Assure Regulatory Compliance**

Easily implement security controls and establish an audit trail.

**✓ Let End Users Collaborate Securely**

Easily ensure secure and compliant sharing of sensitive data for all users.

**✓ Accelerate Task and Workflow Creation**

Enable your team with programming-free automation of multi-step, logic-based workflows.

28.    As demonstrated above, Defendants Ipswitch and Progress heavily tout and promote the MOVEit products and services as capable of safely transferring sensitive information. Despite these assurances and claims, Defendants Ipswitch and Progress failed to offer safe and secure file transfer products and failed to adequately protect Plaintiff's and Class members' PII.

29.    This is because the products that Defendants Ipswitch and Progress offered, and which Midland used, were not secure. When the Data Breach occurred, there was a critical vulnerability in the MOVEit software referred to as CVE-2023-34362. Specifically, Defendants Ipswitch and Progress identified that MOVEit's web-based front end is affected by a critical structured query language (SQL) injection vulnerability/attack vector that can be exploited by an unauthenticated attacker to access databases associated with the product.

---

[7] *Id.*

30.     All of the Defendants knew or should have known that MOVEit leaves the PII of Midland's customers, including Plaintiff and Class member, exposed to security threats. Despite this, Ipswitch and Progress continued to offer MOVEit file transfer products without adequately testing and identifying the vulnerabilities in the products, and patching or otherwise eliminating those threats. Similarly, Midland continued to use the MOVEit software without adequately ensuring it was secure and that Ipswitch and Progress had adequate data security systems and practices in place to protect Plaintiff and Class members' PII.

### Midland Financial Co., MidFirst Bank, and Vio Bank

31.     Midland Financial Co. is the holding company for MidFirst Bank.[8] Vio Bank "is the online bank division of MidFirst Bank."[9] Vio Bank is not a separate legal entity from MidFirst Bank, but merely a division within MidFirst Bank.[10]

32.     "MidFirst Bank serves approximately 900,000 accounts for customers nationwide and offers a full range of personal, commercial, trust, private banking and mortgage banking products and services."[11]

33.     MidFirst Bank is the largest privately owned bank in America with more than $36.5 billion in assets.[12] MidFirst Bank has approximately 78 locations in Oklahoma, Texas, Colorado,

---

[8] *Midland Financial Co. and 1st Century Bancshares, Inc. Complete Merger Transaction*, MIDFIRST (July 1, 2016), https://www.midfirst.com/inside-midfirst/press-releases/midland-financial-co-and-1st-century-bancshares-inc-complete-merger-transaction.

[9] *Why Vio Bank*, VIO BANK, https://www.viobank.com/about (last accessed Sept. 5, 2023).

[10] *See id.*

[11] *About Us*, MIDFIRST, https://www.midfirst.com/inside-midfirst/about-us (last accessed Sept. 5, 2023).

[12] *See id.*

Arizona, and California.[13] There are no physical bank locations operating under the name Vio Bank—all of its services are offered online only.

34.    MidFirst Bank's website states that its customers' "information security is paramount to MidFirst Bank."[14]

35.    The Vio Bank website states "MidFirst Bank, acting through its Vio Bank division, is dedicated to protecting the financial information you entrust to us and helping protect you from identity theft."[15]

36.    Vio Bank's website contains a Privacy Notice that states "we use security measures that comply with federal law," including "computer safeguards and secured files."[16]

37.    The Privacy Notice also states that Vio Bank will require third-party service providers to protect "nonpublic personal information from unauthorized access."[17]

38.    MidFirst Bank's website acknowledges that identity theft can occur when thieves "use credit card numbers, Social Security numbers, addresses or phone numbers to open a credit card or bank account, allowing for fraudulent purchases and other criminal activities. For the victim, correcting the damage can be costly and time consuming."[18]

---

[13] *Proud to be the Largest Privately Owned Bank in the United States.*, MIDFIRST, https://www.midfirst.com/inside-midfirst/largest-privately-owned-us-bank (last accessed Sept. 51, 2023).

[14] *Information Security*, MIDFIRST, https://www.midfirst.com/information-security (last accessed Sept. 5, 2023).

[15] *Security Policy*, MIDFIRST, https://www.viobank.com/disclosure/security-policy (last accessed Sept. 5, 2023).

[16] *Privacy Notice*, VIO BANK, https://www.viobank.com/Documents/Vio/VioPrivacyNotice.pdf (last accessed Sept. 5, 2023). A substantively identical notice appears on MidFirst's website. https://www.midfirst.com/Documents/PDF/Privacy_Notice.pdf.

[17] *Privacy Notice*, VIO BANK, *supra* note 16.

[18] *Information Security*, *supra* note 14.

39.     Midland shared Plaintiff's and Class members' PII with Ipswitch and Progress via the MOVEit software in connection with providing banking or other financial services to Plaintiff and Class members.[19] In doing so, it failed to ensure that Ipswitch and Progress implemented and maintained adequate data security practices to protect Plaintiff's and Class member's PII from unauthorized access, disclosure, and theft.

### The Data Breach

40.     Between approximately May 27 and May 31, 2023, unauthorized persons exploited a vulnerability in the MOVEit software to access and download files containing the sensitive PII of Plaintiff and Class members.[20]

41.     According to reports, the Clop (also known as CLOP or Cl0p) ransomware gang is responsible for the attack on the MOVEit platform.[21]

42.     On or about May 31, 2023, Progress and Ipswitch alerted their customers, including Midland, about a critical vulnerability in the MOVEit software and the Data Breach. Despite this, Midland waited until approximately August 18, 2023, over 11 weeks later, to begin notifying its customers of the Data Breach.[22]

43.     The Cybersecurity and Infrastructure Security Agency (CISA) and the FBI first warned on June 7, 2023, that the Clop ransomware gang was exploiting a vulnerability in MOVEit Transfer. "Internet-facing MOVEit Transfer web applications were infected with a specific

---

[19] *See Notice Letter*, MidFirst (Aug. 18, 2023), https://www.mass.gov/doc/assigned-data-breach-number-30340-midfirst-bank/download.

[20] *Id.*

[21] *See Clop Gang to Earn Over $75 Million from MOVEit Extortion Attacks*, Bleeping Computer (July 21, 2023, 12:34 PM), https://www.bleepingcomputer.com/news/security/clop-gang-to-earn-over-75-million-from-moveit-extortion-attacks/.

[22] *See Notice Letter*, *supra* note 19.

malware used by CL0P, which was then used to steal data from underlying MOVEit Transfer databases," the advisory said, as it explained how threat actors carried out the attack.[23]

44.    A senior CISA officer informed reporters that "several hundred" businesses and organizations in the United States may be impacted by the hacking campaign in addition to government entities.[24]

45.    As a result of the MOVEit Data Breach, Plaintiff and Class members have had their sensitive PII exposed as a result of Ipswitch and Progress's unsecure MOVEit file transfer product being exploited by cyber criminals during the Data Breach, and because Midland failed to ensure the third parties it contracts with to provide services to Plaintiff and Class members maintained adequate data security systems and practices.

### *Defendants Knew that Criminals Target PII*

46.    At all relevant times, Defendants knew, or should have known, that the PII that they collected was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from cyber-attacks that Defendants should have anticipated and guarded against.

47.    It is well known among companies that store sensitive personally identifying information that such information—such as the Social Security numbers ("SSNs") and financial

---

[23] Bruce Sussman, *Clop Ransomware and the MOVEit Cyberattack: What to Know*, BLACKBERRY BLOG (June 19, 2023), https://blogs.blackberry.com/en/2023/06/clop-ransomware-and-moveit-cyberattack.

[24] Onur Demirkol, *US Government Under Seige: MOVEit Breach Exposes Critical Data to Ruthless Clop Ransomware Attack*, DATA CONOMY (June 19, 2023), https://dataconomy.com/2023/06/19/moveit-breach-data-clop-ransomware/ (last accessed Sept. 5, 2023).

information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers …. Many of them were caused by flaws in … systems either online or in stores."[25]

48.    PII is a valuable property right.[26] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[27] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[28] PII is so valuable to identity thieves that once it has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

49.    Identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information

---

[25] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[26] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"),
https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[27] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[28] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

50.     Consumers place a high value on the privacy of their data, as they should. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[29]

51.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of the consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII Has Grave and Lasting Consequences for Victims*

52.     Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[30] [31]

53.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

---

[29] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[30] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Sept. 5, 2023).

[31] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[32]

54.      Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[33]

55.      Theft of SSNs also creates a particularly alarming situation for victims because SSNs cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of their SSN. Thus, a new SSN will not be provided until after the harm has already been suffered by the victim.

56.      Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (*e.g.*, name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. *TIME* quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[34]

57.      There may also be time lags between when sensitive personal information is stolen, when it is used, and when a victim discovers it has been used. On average it takes approximately

---

[32] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[33] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Sept. 5, 2023).

[34] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

three months for consumers to discover their identity has been stolen and used, but it takes some victims up to three years to learn that information.[35]

58.    Plaintiff and Class members must now live with the knowledge that their PII is forever in cyberspace, having been stolen by criminals willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

### *Damages Sustained by Plaintiff and Class Members*

59.    Plaintiff and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft—risk which justifies or necessitates expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

### CLASS ALLEGATIONS

60.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

61.    Plaintiff brings this action on his own behalf, and on behalf of the following National Class:

> All persons who are customers of Midland Financial Co., including customers of MidFirst Bank and Vio Bank, whose personally identifiable

---

[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

information was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

62.    Plaintiff also brings this action on behalf of the following sub-class (the "California Class"):

All citizens of California who are customers of Midland Financial Co., including customers of MidFirst Bank and Vio Bank, whose personally identifiable information was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

63.    Excluded from the National Class and California Class are: (i) Defendant Ipswitch, Inc.'s affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; (ii) Defendant Progress Software Corporation's affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; (iii) Defendant Midland Financial Co.'s affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; and (iv) the judge(s) presiding over this matter and the clerks of said judge(s).

64.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

65.    The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Midland reported to the Texas Attorney General that approximately 20,479 persons in Texas were affected,[36] and reported to the Massachusetts Attorney General that approximately 3,818 persons in Massachusetts were affected.[37]

---

[36] *See Data Security Breach Reports*, TX. ATT'Y GEN., https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search for "MidFirst").

[37] *See* https://www.mass.gov/doc/data-breach-report-2023/download.

66.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, inter alia:

a.      whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure, including ensuring that the third parties it contracts with to provide services had adequate data security measures in place;

b.      whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII';

c.      whether an implied contract existed between Class members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII from unauthorized access and disclosure;

d.      whether Defendants breached their duties to protect Plaintiff's and Class members' PII; and

e.      whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

67.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

68.     Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

69.     Plaintiff will fairly and adequately protect the interests of the Class members.

Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

70.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### On behalf of the National Class

71.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

72.     Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII in their possession, custody, or control.

73.    Defendants knew or should have known the risks of collecting and storing Plaintiff's and Class members' PII and the importance of maintaining secure systems, including ensuring third party vendors employed adequate data security practices. Defendants knew or should have known that they faced an increased threat of customer data theft, as judged by the many data breaches that have targeted companies that stored PII in recent years.

74.    Given the nature of Defendants' businesses, the sensitivity and value of the PII they collect, store, and maintain, and the resources at their disposal, Defendants should have taken care to identify the vulnerabilities to their systems or to their third-party vendors' systems and prevented the Data Breach from occurring.

75.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them—including Plaintiff's and Class members' PII.

76.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

77.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

78.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) loss of value of the PII that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

**COUNT II**
**NEGLIGENCE PER SE**
**On behalf of the National Class**

79.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80.    Defendants' duties arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair … practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendants, of failing to employ reasonable measures to protect and secure PII.

81.    Plaintiff and Class members are the persons that the Section 5 of the FTCA was intended to protect, and the harm that Plaintiff and Class members suffered is the type of harm Section 5 of the FTCA is intended to guard against.

82.    Defendants knew the risks of collecting and storing Plaintiff's and Class members' PII and the importance of maintaining secure systems, or of ensuring that third parties it contracts with and shares PII with maintain secure systems. Defendants knew of the many data breaches that targeted companies that collect, store, and share PII in recent years.

83.    Given the nature of Defendants' businesses, the sensitivity and value of the PII they collect, share, and maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems, or the systems of third parties the contract with and share PII with, and prevented the Data Breach from occurring.

84.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to, or failing to ensure the third parties they contract with and share PII with, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them—including Plaintiff's and Class members' PII.

85.    Defendants' violation of Section 5 of the FTCA constitutes negligence per se.

86.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to or failing to ensure the third parties they contract with and share PII with, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

87. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

88. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) loss of value of the PII that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**On behalf of the National Class against Midland**

89. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90. Plaintiff brings this claim only against Midland.

91. In connection with the dealings Plaintiff and Class members had with Defendants, Plaintiff and Class members entered into implied contracts with Midland.

92. Pursuant to these implied contracts, Plaintiff and Class members provided Midland with their PII, directly or indirectly, for Midland to provide services. In exchange, Midland agreed to, among other things, and Plaintiff and Class members understood that

Midland would: (1) provide services to Plaintiff and Class member; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII; and (3) protect Plaintiff's and Class members' PII in compliance with federal and state laws and regulations and industry standards.

93.     The protection of PII was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Midland, on the other hand. Indeed, Midland was clear in its representations regarding privacy, and on the basis of those representations Plaintiff and Class members understood that Midland supposedly respects and is committed to protecting customer privacy.

94.     Had Plaintiff and Class members known that Midland would not adequately protect its customers' and former customers' PII, they would not have provided Midland with their PII.

95.     Plaintiff and Class members performed their obligations under the implied contracts when they provided Midland with their PII, either directly or indirectly.

96.     Midland breached its obligations under its implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII in a manner that complies with applicable laws, regulations, and industry standards, including by not ensuring that the third parties it contracts with and shares PII with implemented and maintained adequate security protocols and procedures.

97.     Midland's breach of its obligations of the implied contracts with Plaintiff and Class members directly resulted in their PII being affected in the Data Breach and the injuries

that Plaintiff and all other Class members have suffered as a result of and in connection thereto.

98.     Plaintiff and all other Class members were damaged by Midland's breach of implied contracts because: (i) they paid—directly or indirectly—for data security protection they did not receive; (ii) they face a substantially increased and imminent risk of identity theft—a risk justifying or necessitating expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### On behalf of the National Class against Midland

99.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100.    Plaintiff brings this claim only against Midland.

101.    Plaintiff and Class members gave Midland their PII in confidence, believing that Midland would protect that information. Plaintiff and Class members would not have provided Midland with this information had they known it would not be adequately protected.

102.    Midland's acceptance and storage of Plaintiff's and Class members' PII created a fiduciary relationship between Midland and Plaintiff and Class members. In light of this relationship, Midland must act in good faith primarily for the benefit of its customers, which includes safeguarding and protecting Plaintiff's and Class members' PII.

103.    Due to the nature of the relationship between Midland and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon Midland to ensure that their PII was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of Midland's data security policies and practices or the extent to which it ensured that the third parties it contracts with and shares PII with maintained adequate data security practices and protocols, and Midland was in an exclusive position to guard against the Data Breach.

104.    Midland has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by, among other things, failing to properly safeguard Plaintiff's and Class members' PII that it collected, failing to ensure Plaintiff's and Class members' PII was shared with entities with adequate data protection systems and measures in place, and failing to notify Plaintiff and Class members of the Data Breach in a timely manner.

105.    As a direct and proximate result of Midland's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

<u>**COUNT V**</u>
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT OF 2018**
**Cal. Civ. Code §§ 1798.100 et seq. ("CCPA")**
**On behalf of the California Class**

106.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

108.    Plaintiff is a "consumer" as defined by Civ. Code § 1798.140(i) because he is a "natural person who is a California resident, as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

109.    Defendants are "business[es]" as defined by Civ. Code § 1798.140(d) because each:

    a. is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

    b. "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

    c. does business in California; and

    d. has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 100,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

26

110.    Plaintiff's PII was subject to unauthorized access and exfiltration, theft, or disclosure because of Defendants' inadequate security measures.

111.    Plaintiff's PII was in nonencrypted and nonredacted form, allowing criminals full access to it.

112.    The Data Breach occurred as a result of Ipswitch's and Progress's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information and Midland's decision to trust Ipswitch and Progress with its customers' sensitive PII. Defendants failed to implement reasonable security procedures (including improper vetting of third parties by Midland) to prevent unauthorized access of Plaintiff's and Class members' PII as a result of a cyber-attack.

113.    Plaintiff will provide written notice to Defendants pursuant to Civil Code § 1798.150(b), identifying the specific provisions of the CCPA Plaintiff alleges Defendants have or are violating. Although a cure is not possible under the circumstances, if as expected Defendants are unable to cure or do not cure the violation within 30 days of receipt, Plaintiff will amend this complaint to pursue actual or statutory damages as permitted by Civil Code § 1798.150(a)(1)(A).

114.    As a result of Defendants' failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks injunctive and declaratory relief and any other relief as deemed appropriate by the Court.

## COUNT VI
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL")
### On behalf of the California Class

115.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

116.    The California Unfair Competition Law, Bus. & Prof. Code §§ 17200 et seq., prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

117.    In the course of conducting their business, Ipswitch and Progress committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, the CCPA, Section 5 of the FTCA and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiff and Class members reserve the right to allege other violations of law by Ipswitch and Progress constituting other unlawful business acts or practices. Ipswitch's and Progress's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

118.    In the course of conducting its business, Midland committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, and protocols, including contracting with outside entities to handle its customers' sensitive PII, to safeguard and protect Plaintiff's and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, the CCPA, Section 5 of the FTCA and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiff

and Class members reserve the right to allege other violations of law by Midland constituting other unlawful business acts or practices. Midland's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

119.     Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), and Section 5 of the FTCA. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

120.     The UCL also prohibits any "fraudulent business act or practice." Defendants' nondisclosures and misrepresentations regarding the vulnerability of their network systems (as to Ipswitch and Progress) and their inadequate data security (as to all Defendants) were false, misleading and likely to deceive the consuming public in violation of the UCL.

121.     The injury and harm that Plaintiff and Class members suffered was the direct and proximate result of Defendants' violations of the UCL. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risk which justifies or necessitates expenditures for protective and remedial services, for which they are entitled to compensation; (ii)

improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

122.    Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself, Class members, and the general public, also seeks restitution and an injunction prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

**<u>COUNT VI</u>**
**UNJUST ENRICHMENT**
**On behalf of the National Class**

123.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

124.    This claim is pleaded in the alternative to the breach of implied contract claim.

125.    Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of their valuable PII.

126.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members by storing or transferring the PII, or otherwise using it to facilitate their business.

127.   As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the loss of value of Plaintiff's and Class members' PII.

128.   Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A.   Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as class representative and undersigned counsel as class counsel;

B.   Award Plaintiff and Class members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C.   Award declaratory and injunctive relief as permitted by law or equity to assure that Class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D.   Award Plaintiff and Class members pre-judgment and post-judgment interest to the maximum extent allowable;

E.   Award Plaintiff and Class members reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Award Plaintiff and Class members such other favorable relief as allowable under

law or at equity.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  September 6, 2023                          Respectfully submitted,

                                                   */s/ Tyler J. Bean*
                                                   Tyler J. Bean (Bar No. 33834)
                                                   **SIRI & GLIMSTAD LLP**
                                                   745 Fifth Avenue, Suite 500
                                                   New York, NY 10151
                                                   Telephone: (212) 532-1091
                                                   tbean@sirillp.com

                                                   Ben Barnow*
                                                   Anthony L. Parkhill*
                                                   **BARNOW AND ASSOCIATES, P.C.**
                                                   205 West Randolph Street, Suite 1630
                                                   Chicago, IL 60606
                                                   Telephone: 312-621-2000
                                                   Facsimile: 312-641-5504
                                                   b.barnow@barnowlaw.com
                                                   aparkhill@barnowlaw.com

                                                   *Attorneys for Plaintiff and the Proposed Class*

                                                   *\*pro hac vice forthcoming*